| | |
|---|---|
| LEVY ILLINOIS LIMITED PARTNERSHIP, COMPASS GROUP USA, INC., LEVY PREMIUM FOODSERVICE LIMITED PARTNERSHIP<br><br>Plaintiffs,<br><br>vs.<br><br>SCOTT SWEENEY, an individual;<br><br>Defendant. | **COMPLAINT** |

Plaintiffs Levy Illinois Limited Partnership, its parent company, Compass Group USA, Inc. and its affiliate Levy Premium Foodservice Limited Partnership (collectively "Levy"), by and through their undersigned counsel, Ogletree, Deakins, Nash, Smoak & Stewart P.C., hereby pleads and alleges in this Complaint as follows:

## NATURE OF THE ACTION

1. Scott Sweeney, the individual Defendant named in this action ("Sweeney" or "Defendant"), is a former employee of Levy Illinois Limited Partnership. Sweeney was subject to an Employment and Non-Compete Agreement, which contained various restrictive covenants. Sweeney is in breach of multiple restrictive covenants contained in that agreement. Levy seeks damages, and other relief against Sweeney that they have sustained on account of Sweeney's conduct.

## PARTIES, JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter pursuant to the exclusive forum selection clause contained in the parties' Non-Compete Agreement described below.

3. Levy Illinois Limited Partnership and Levy Premium Foodservice Limited Partnership are indirect subsidiaries of Compass Group USA, Inc. Both are Illinois limited partnerships, with headquarters in Chicago, Illinois.

1

4. Compass Group USA, Inc. is a Delaware corporation with a principal place of business in Charlotte, North Carolina.

5. Sweeney is a resident of Golden, Colorado. Upon information and belief, he resides at 16492 W. 61st Place, Golden, CO, 80403.

6. Sweeney owns a consulting business called F2 Hospitality, LLC, with its principal place of business located at 16492 W. 61st Place, Golden, CO, 80403.

7. This Court has subject matter jurisdiction pursuant to N.C. Gen. Stat. §§ 7A-240 and 7A-243.

8. This Court has subject-matter jurisdiction over this action pursuant to 28 § U.S.C. 1332 because the parties are residents and citizens of different states, and the amount in controversy exceeds $75,000. All Plaintiffs are either residents of Illinois or Delaware, while Defendant is a citizen of Colorado.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

10. Further, this Court has jurisdiction over this dispute and venue is proper in this Court pursuant to the Employment Agreement and Non-Compete Agreement ("Non-Compete Agreement") and the Terms of Separation from Employment with Compass Group USA, Inc. Release of Claims and Protective Covenants Agreement ("Separation Agreement") entered into between Levy and Sweeney.

## GENERAL ALLEGATIONS

*Background Information on Levy and Sweeney*

11. Levy provides world class food and beverage and catering services to sports venues and cultural institutions around the country. Allegiant Stadium was among the many venues where Levy was contracted to provide such services pursuant to a contract between LV Stadium Events Company, LLC ("Las Vegas Raiders") and Levy Premium Foodservice Limited Partnership. Recently, Levy was informed that it would no longer provide those services, effective March 31, 2025.

12. Sweeney began his employment with Levy on or about February 2006. During his

2

employment, Sweeney held several positions with Levy, including in the last decade, National Director of Concessions, Vice President of Global Openings and Special Projects, and Regional Vice President West Division.

13. From January 2023 until the time of his separation on April 22, 2024, Sweeney worked as Levy's Vice President of Mountain Resorts.

14. In his capacity as a Vice President of Mountain Resorts, Sweeney was responsible for oversight of all Levy operations on ski resorts across the Company, including soliciting new business opportunities for locations that Levy did not yet operate.

15. During the last 12 months of his employment, Sweeney's geographic area of responsibility, and the cities, counties and parishes in which he performed services included, but were not limited to Colorado, Utah, California, Nevada (including Las Vegas), New York, Wyoming, Vermont, and parts of Canada.

16. During the last 12 months of his employment, Sweeney had contact with, performed work for and/or obtained Confidential Information about numerous Levy customers, including Allegiant Stadium.

17. As part of his most recent role as Vice President of Mountain Resorts, Sweeney worked and became aware of the abilities, performance, salaries, and other confidential information of various managers from Levy's Allegiant Stadium account. Allegiant Stadium managers often provided support of the mountain resorts properties and Sweeney interacted with those managers in his role.

18. For Sweeney to effectively perform his duties, it was necessary for Levy to expose him to certain of Levy's trade secrets and/or confidential and proprietary information, and for Sweeney to develop substantive contacts with Levy's customers and employees. For example, Sweeney and other high-level leadership across Levy would participate in various monthly calls where confidential and proprietary information about Levy's business and key accounts would be shared—including information about Levy's operations at Allegiant Stadium.

*Sweeney's Employment Agreement*

19. On October 26, 2015, in exchange for the payment of $1,000.00 as well as a potential payment equal to 12 months' pay subject to certain terms and conditions, Sweeney executed the Non-Compete Agreement . A true and correct copy of the Non-Compete Agreement, as maintained in the ordinary course of business, is attached hereto as **Exhibit 1**.

20. In consideration of the foregoing benefits and opportunities Sweeney promised, among other things, not to engage in limited direct competition with Compass and Levy. The Non-Compete Agreement include numerous restrictive covenants, including the following:

> 5. Non-Compete. During the Non-Compete Period, I agree not to: (a) engage in Competitive Activity within the Prohibited Territory; or (b) assist anyone else to engage in Competitive Activity within the Prohibited Territory. "Non-Compete Period" means: (i) the period I am employed by the Company or its affiliates; and (ii) a period of 12 months after my Separation Date. "Competitive Activity" means: (i) engaging in work for a competitor of the Company that is the same as or substantially similar to the work I performed on behalf of the Company at any time during the 12 months prior to my Separation Date; or (ii) engaging in any aspect of the Company's business that I was involved with on behalf of the Company at any time during the 12 months prior to my Separation Date. "Prohibited Territory" means: (i) my geographic area of responsibility for the Company at any time during the 12 months prior to my Separation Date; and (ii) each city, county and parish in which I performed services on behalf of the Company at any time during the 12 months prior to my Separation Date.
>
> 6. Non-Interference. During the Non-Interference Period, I agree not to: (a) solicit or encourage any Restricted Customer to obtain any services or products from a competitor of the Company; (b) sell or provide any services or products to a Restricted Customer that are competitive with or a substitute for the Company's services or products; (c) solicit or encourage any supplier to reduce its business with the Company; (d) make any disparaging remarks about the Company or its business, services, affiliates, or employees, whether in writing, verbally, or on any online forum; and/or (e) assist anyone else to engage in any of the conduct prohibited in this Section. "Non-Interference Period" means: (i) the period I am employed by the Company or its affiliates; and (ii) a period of 12 months after my Separation Date. "Restricted Customer" means: (i) any customer of the Company with whom I had contact or communications, or for whom I performed work, at any time during the 12 months prior to my Separation Date; (ii) any customer of the Company for whom I assisted with the Company's dealings at any time during the 12 months prior to my Separation Date; (iii) any customer of the Company about whom I obtained Confidential Information at any time during the 12 months prior to my Separation Date; and (iv) any prospective Company customer for whom I assisted with a proposal at any time during the 12 months prior to my Separation Date.

7. <u>Non-Raiding</u>. During the Non-Interference Period, I agree not to directly or indirectly: (a) solicit any person employed by the Company with whom I worked or about whose abilities I became aware while employed by the Company (each, a "<u>Restricted Employee</u>") to leave the Company; or (b) offer employment to, hire as an employee or engage as an independent contractor any Restricted Employee.

(*See* Exhibit 1 at ¶¶ 5, 6, 7) (hereinafter referred to as "Existing Restrictive Covenants").

21. The Non-Compete Agreement also included the following non-disclosure provision:

<u>Confidential Information</u>. Except to the extent the use or disclosure of any Confidential Information is required to carry out my assigned duties with the Company, I agree that during my employment with the Company and for 3 years thereafter I will not use any Confidential Information or disclose any Confidential Information to any person not employed by the Company. This provision, however, shall not preclude me: (x) from the use or disclosure of information known generally to the public other than as a result of my violation of this Agreement, or (y) from any disclosure required by law or court order, provided I provide the Company immediate written notice of any such potential disclosure. "<u>Confidential Information</u>" means confidential, proprietary or business information related to the Company's business that is obtained or created by me during my employment with the Company and which could be used to harm or compete against the Company. Confidential Information includes, but is not limited to, such information relating to customers, suppliers, contractual terms, billing histories, financial information, pricing, business plans, marketing efforts, sales strategies, operating methods, service performance, services and products.

(*See* Exhibit 1 at ¶ 8).

22. Finally, the Non-Compete Agreement also included the following provision:

<u>Reasonableness</u>. I agree that the restrictions in this Agreement are fair, reasonable and necessary to protect the Company's confidential information, trade secrets, goodwill, and legitimate business interests, and will not prevent me from earning a living. As such, I agree not to contest the general validity of this Agreement. If I breach this Agreement, then (a) any Severance Pay will stop and I must repay the Severance Pay beyond $1,000.00 (without limiting the effectiveness of the Release), and (b) the Company will be entitled to injunctive relief, its damages and reasonable attorneys' fees.

(*See* Exhibit 1 at ¶ 11).

### *Sweeney's Work Relationship with Julia Lombardi and Nick Wolfe*

23. Levy employs operations leaders throughout the country to oversee, manage, and strategize services at its venues. For example, Levy employed Julia Lombardi as the Vice President of Hospitality & Strategy to manage its operations at Allegiant Stadium in Las Vegas,

Nevada. Lombardi was the highest-level location manager employed by Levy at that location. Although Lombardi is still employed by Levy, she is no longer managing its operations at Allegiant Stadium.

24. Levy previously employed Nick Wolfe as Vice President of Hospitality & Strategy at Levy's operation at Levi's Stadium, home of the San Francisco 49ers. Following his employment with Levy, Wolfe was employed by the San Francisco 49ers as Vice President of Hospitality and Retail where he oversaw operations at Levi's Stadium for the team's ownership and worked directly with Levy personnel responsible for the food and beverage operations at that facility.

25. Sweeney worked with both Wolfe and Lombardi when he was employed at Levy. Wolfe previously reported directly to Sweeney in his role as Regional Vice President of Levy's West Division when Wolfe worked for Levy at Levi's Stadium. In her role as Assistant Director of Operations of T-Mobile Arena in Las Vegas, Nevada, Lombardi worked directly with Sweeney in opening the property for Levy. Also, in her role as Director of Global Openings, Lombardi reported through Sweeney in his role as Vice President of Global Openings and Special Projects.

*Sweeney's Separation from Levy*

26. On or about April 22, 2024, Levy informed Sweeney that his employment was being terminated.

27. Following his termination, Levy and Sweeney entered into the Separation Agreement that was executed by Sweeney on May 9, 2024. A true and correct copy of the Agreement, as maintained in the ordinary course of business, is attached hereto as **Exhibit 2**.

28. Pursuant to the Separation Agreement, Levy agreed to pay Sweeney $133,215.00, less applicable tax withholdings ("Separation Payments"). Levy has made these Separation Payments to Sweeney in compliance with the Separation Agreement.

29. In consideration of the foregoing, Sweeney agreed to release Levy and its parent and affiliates from any and all claims, and promised, among other things, to repay the Separation Payments in the event he breached the Separation Agreement, less $1,000.00. In addition,

6

Sweeney agreed to remain bound by the Existing Restrictive Covenants as set forth in his 2015 Non-Compete Agreement. Specifically, Sweeney agreed to the following provisions:

> 12. **Existing Restrictive Covenants.** You understand and agree that your existing Employment and Non-Compete Agreement with the Company includes post-employment restrictive covenants including non-competition, customer non-interference and employee non-raiding provisions (collectively, the "***Existing Restrictive Covenants***"). You agree to comply with such Existing Restrictive Covenants. The Existing Restrictive Covenants are incorporated herein by reference and a breach of the Existing Restrictive Covenants shall be deemed a breach of this Agreement.
>
> 11. **Confidential Information**. You recognize and acknowledge that during the course of your employment with the Company, the Company disclosed to you certain valuable, confidential and/or proprietary information and material related to the Company's business. You agree that during your employment with the Company and for 3 years thereafter you will not use any Confidential Information or disclose any Confidential Information to any person not employed by the Company. This provision, however, shall not preclude you from: (x) the use or disclosure of information known generally to the public other than as a result of your violation of this Agreement; (y) any disclosure required by law or court order; or (z) communicating in confidence with a government official solely for the purpose of reporting or investigating a suspected violation of law. "***Confidential Information***" means confidential, proprietary or business information related to the Company's business that is obtained or created by you during your employment with the Company and which could be used to harm or compete against the Company. Confidential Information includes, but is not limited to, such information relating to customers, suppliers, contractual terms, billing histories, financial information, pricing, business plans, marketing efforts, sales strategies, operating methods, service performance, services and products.
>
> 5. **Loss of Eligibility and Breach**. You understand and agree that if, during the time you are receiving Separation Payments, you breach this Agreement, or if the Company becomes aware of additional information that, notwithstanding the events culminating in your termination, also would have resulted in your termination for Cause (as defined below), then (a) you will cease to be eligible for payments and benefits under this Agreement beyond $1,000.00 in Separation Payments, (b) the Company may, in its sole discretion, discontinue any remaining payments and benefits under this Agreement, and (c) you agree to repay upon demand from the Company the value of any payments and benefits previously received under this Agreement beyond $1,000.00 in Separation Payments (all without impairing your obligations or release herein or limiting the Company's remedies or damages). For purposes of this Agreement, "Cause" shall mean the definition of "Cause" included in your Employment and Non-Compete Agreement.

(*See* Exhibit 2 at ¶¶ 5, 11, 12).

### ***Sweeney's Work for Oak View Group and Breach of his Existing Restrictive Covenants***

30. Oak View Group ("OVG") is a direct competitor of Levy. Until recently, OVG

7

focused on providing, among other services, concession, food and beverage and catering services to facilities excluding sports venues. Recently, OVG has begun competing with Levy with respect to sports venues and events and seeking to expand its business in that segment of the market.

31. Upon information and belief, on or about May 2, 2024, Sweeney formed a Limited Liability Company named F2 Hospitality LLC ("F2").

32. On February 11, 2025, Sweeney texted Lombardi and asked her to call him back when she had time. She returned his call and during their conversation, Sweeney stated that he was "very friendly" with Oak View Group President Kenneth Gaber and that OVG is taking over "an NFL account in Las Vegas" and that he would love to introduce her to Gaber. Sweeney then coached her regarding knowing her value when OVG made her a job offer regarding the Raiders account and that she should start any salary demand at $300,000. He told Lombardi that she "[had] all the cards" to negotiate with OVG. Sweeney asked her to please not tell Levy about their conversation.

33. Shortly thereafter, Lombardi received a call from Nick Wolfe, Levy's former Vice President of Hospitality & Strategy at Levi's Stadium, who informed her that Sweeney had reached out to him via text and asked Wolfe to coach Lombardi regarding her options for a role with OVG.

34. On or about February 18, 2025, the Las Vegas Raiders informed Levy that they were terminating Levy's contract to provide concession, food and beverage and catering services at Allegiant Stadium. Such services are now provided by OVG, and OVG and/or Sweeney solicited key Levy employees at Allegiant Stadium including Lombardi, and the management Levy employed who reported to Lombardi.

35. Through his actions, Sweeney engaged in the direct and indirect recruitment and solicitation of Levy's employees and direct competition with Levy on behalf of OVG, a competitor, in direct violation of his Non-Compete Agreement and Separation Agreement. Upon information and belief, through its actions, OVG acted in active concert and participation with Sweeney in directly and indirectly recruiting, soliciting and hiring Levy's employees who worked at Allegiant Stadium.

36. Upon information and belief, Sweeney engaged in other violations of the Non-Compete Agreement's restrictive covenants starting as early as April 2024.

*After-Acquired Evidence of Sweeney's Bad Acts*

37. After Sweeney's termination on or about April 22, 2024, Levy learned that Sweeney engaged in extremely poor performance, willful misconduct, violation of company policy and agreements, willful inability to perform the essential functions of his job, and other bad acts which fall within the Non-Compete Agreement's "Cause" definition. *See* **Exhibit 1** at ¶ 3.

38. Any of this conduct individually would have resulted in Sweeney's termination for Cause if Levy had become aware of these events prior to his termination.

39. Because Levy has become "aware of additional information, that, notwithstanding the events culminating in [Sweeney's] termination, also would have resulted in [Sweeney's] termination for Cause," Sweeney must "repay upon demand from the Company the value of any payments and benefits previously received under this Agreement beyond $1,000.00 in Separation Payments[.]" *See* **Exhibit 2** at ¶ 5.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

40. Levy restates the allegations of the foregoing Paragraphs.

41. The Non-Compete Agreement and Separation Agreement are valid and binding contracts entered into between Sweeney and Compass Group USA, Inc.

42. The Non-Compete Agreement and Separation Agreement are supported by sufficient consideration.

43. Defendant has violated his Non-Compete Agreement and Separation Agreement with Levy by recruiting and soliciting Levy's employees, and in other and further ways to be proven at trial.

44. As a consequence of the foregoing, Levy has sustained damages that include monetary and other presently unquantifiable damages to the good-will of Levy's business.

45. As a consequence of the foregoing, Levy has suffered, and continues to suffer,

damages in excess of $75,000.00, including but not limited to costs and fees incurred to retain its employees in the face of Levy's unlawful solicitations.

46. As a result of Defendant's breaches of the Non-Compete Agreement and Separation Agreement, Levy is entitled to recover the Separation Payments, less $1,000.00.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

47. Levy restates the allegations of the foregoing Paragraphs.

48. Under North Carolina law, every contract imposes on each party a duty of good faith and fair dealing in its performance.

49. Where one party to a contract deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing.

50. As stated above, Levy and Sweeney were both parties to a valid contract, namely the Non-Compete Agreement and Separation Agreement.

51. In connection with these agreements, Sweeney owed Levy a duty of good faith and fair dealing.

52. As demonstrated by his conduct described above, Sweeney breached his duty and acted in a manner that is in direct contravention to the purpose of the agreements.

53. Accordingly, Levy's justifiable expectations were repeatedly denied as Sweeney deprived Levy of the benefits it reasonably expected to receive under the agreement, due to Sweeney's past breaches of the non-competition, non-solicitation, and non-raiding provisions of the Agreement.

54. As a proximate result of Sweeney's conduct, Levy has suffered damages, including, but not limited to, significant economic loss which is currently incalculable.

55. Levy is also entitled to recover its reasonable attorneys' fees incurred as a result of Sweeney's breaches of the Non-Compete Agreement pursuant to Section 11.

### THIRD CLAIM FOR RELIEF
#### (Tortious Interference with Business Relationships)

56. Levy restates the allegations of the foregoing Paragraphs.

57. Defendant Sweeney was aware of business relationship(s) by and between certain key employee(s) of Levy, including Julia Lombardi ("Lombardi").

58. As demonstrated by his conduct described above, Sweeney tortiously interfered with the business relationships by and between key employees and Levy.

59. As demonstrated above, Sweeney acted without justification by soliciting key employee(s) of Levy, including Lombardi.

60. Upon information and belief, Sweeney was motivated by improper purposes including but not limited to his intent to obtain Levy's Confidential Information by and through Lombardi, and/or induce Lombardi to disclose Levy's Confidential Information, for his own personal benefit.

61. As a proximate result of Sweeney's conduct, Levy has suffered damages, including, but not limited to, retention bonuses, compensation payments, and other significant economic loss which is currently incalculable.

62. As a result of Sweeney's interference, Levy is entitled to an award of damages, to include attorneys' fees and costs, and any other relief deemed appropriate by the Court.

63. Sweeny's conduct was wrongful, willful, and malicious. Accordingly, Levy is entitled to recover punitive damages from Sweeny.

### FOURTH CLAIM FOR RELIEF
#### (Unfair and Deceptive Trade Practices Act)

64. Levy restates the allegations of the foregoing Paragraphs.

65. Sweeney's actions described in this Complaint, including but not limited to his

tortious interference with contract constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1.

66. Sweeney's unfair and deceptive trade practices alleged herein took place in or affected commerce.

67. Levy has been and continues to be damaged in excess of $75,000.00 as a result of Sweeny's unfair and deceptive trade practices and is entitled to recover its economic losses.

68. Pursuant to N.C. Gen. Stat. § 75-16, Levy is entitled to treble its actual damages.

69. Pursuant to N.C. Gen. Stat. § 75-16.1, Levy may recover its reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Levy requests that this Court enter judgment in its favor and against Sweeney as follows:

1. An award of compensatory damages greater than $75,000.00 against Sweeney in an amount to be determined at trial;
2. An award of punitive damages against Sweeney for his malicious, willful, and wanton activities complained of in this Complaint;
3. Treble damages pursuant to N.C. Gen. Stat. § 75-16;
4. Attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16, the Non-Compete Agreement, and the Severance Agreement; and
5. For such further relief as this Court deems appropriate.

DATED this 1ˢᵗ day of August, 2025.

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


          /s/ J. Allen Thomas
          J. Allen Thomas, N.C. Bar No. 40117
          Vanessa N. Garrido, N.C. Bar No. 53470
          8529 Six Forks Road, Forum IV, Suite 600
          Raleigh, North Carolina 27615
          Telephone: 919.787.9700
          Allen.Thomas@Ogletree.com
          Vanessa.Garrido@Ogletree.com

          *Attorneys for Plaintiffs Levy Illinois Limited Partnership, et al.*